# COURT OF APPEALS.

## The People agt. Francis McCann.

On the trial of an indictment for murder, where the defence of *insanity* was interposed, the presiding judge at the oyer and terminer, charged the jury as follows: "The fact of killing is admitted; that the act was done by prisoner is not disputed. Thus, the issue is really reversed from the usual one. The question of insanity is matter of positive defence, and it is a defence to be

The People agt. McCann.

affirmatively proved; a failure to prove it is (like all the failures to prove any other fact) the misfortune of the party attempting to make out the proof. And in this case, as in all other cases of fact, you are not to presume what has not been proved under the distinctions, and upon the principles already given you."

" The act being plainly committed, and that the prisoner did it being undoubted, and the defence set up on his part that he was insane, the *burden of proof is shifted.* In the proof of the deed itself, if any reasonable doubt be left on your minds, the prisoner is to be acquitted; but as sanity is the natural state, there is no presumption of insanity, and the defence must be proved *beyond a reasonable doubt.* If (canvassing the whole evidence on the legal principle laid down in the charge) the prisoner has satisfied you so far beyond a reasonable doubt, that you find that he was, at the time of the killing, so far really insane as not to be responsible (under the directions stated to you) for this particular act, you acquit, otherwise you convict."

*Held,* (by the court of appeals,) that although it is true, that sanity is the normal condition of the human mind, and in dealing with acts criminal or otherwise, there can be no presumption of insanity; yet, it is not true, upon the traverse of an indictment for murder, when the defence of insanity is interposed, and the homicide admitted, that the issue is reversed, and the burden is shifted.

The burden is still the same, and it still remains with the prosecution to show the existence of those requisites, or elements which constitute the crime, and of these, the intention, or *malo animo* of the prisoner is the principal. Notwithstanding the legal presumption, the sanity of the prisoner's mind is under all the definitions of the crime, to be made out affirmatively upon the trial, as a part of the case for the prosecution.

There must be care to distinguish between what constitutes proof, including those presumptions which the law regards as equivalent to proof, in a *criminal case,* and what is understood by the burden of proof, or *onus probandi.*

The act of 1855, (*Sess. Laws* 1855, *p.* 613, § 3,) provides substantially that whether any exception shall have been taken or not, on the trial, the prisoner if convicted, can take (on writ of error as matter of right) any exception in or out of the case, and shall be at liberty to claim a new trial on any ground. This statute was considered by the supreme court at the general term, (GOULD, J., delivering the opinion,) and held to be unconstitutional, it being embraced in a local bill on a different subject. The question was not considered (or at least, decided) by the court of appeals. The exceptions in this case were not taken on the trial, but on the argument in the appellate courts.

(The opinion of Judge GOULD in this case, delivered at general term, is given so far as it discusses the questions above stated. The opinion of the court of appeals by Judge BROWN is given entire, and then follows the last charge to the jury of Judge GOULD on the third trial, entire. The case will attract attention and interest from its general notoriety, and particularly so now, as there are occasionally, between the distinguished judges (at the trial, and the appeals) some sharp differences of sentiment flashing up, illuminating the legal horizon, and discovering different sources of judicial construction.—[REPORTER.

*Supreme Court, Albany, March General Term,* 1857.

GOULD, Justice. The remaining ground of exception (the prisoner's 8th point) is one that is of great interest; not merely in this particular case, but to the whole community, as it concerns the entire administration of justice in criminal cases. The frequency, a frequency that is so great as to have passed into a proverb, (if a by-word be not the apter phrase,) the great frequency of the interposition of this plea of insanity, whenever and wherever punishment hangs imminent over crime, makes absolutely necessary the adoption of some rule, that shall be both based on sound principles of plain and easy application, while it shall, to the prisoner and to the public, secure neither more nor less than even-handed justice. And while all human tribunals are bound to treat with reverence the dispensations of providence, and to deal kindly with those who suffer under such dispensations, those tribunals have also in charge the general good of the whole community, and the personal safety of every member of it. Well then, and carefully does it behoove us to inquire what is the nature of this defence of insanity, and by what kind and degree of proof is it to be made out ? To keep the precise point in view, the charge so far as relates to this exception, was : " The question of insanity is matter of positive defence, and it is a defence to be affirmatively proved. A failure to prove it, is (like the failure to prove any other fact) the misfortune of the party attempting to make the proof. And in this case, as in all cases of fact, you are not to presume what has not been proved, (under the distinctions and upon the principles already given you.) The act being plainly committed, and that the prisoner did it, being undoubted, and the defence being set up on his part that he was insane, the burden of proof is shifted. In the proof of the deed itself, if any reasonable doubt be left on your minds, the prisoner is to be acquitted. But as sanity is the natural state, there is no presumption of insanity. And the defence must be proved beyond a reasonable doubt. If canvassing the whole evidence on the legal

principles laid down in this charge, the prisoner has satisfied you so far beyond a reasonable doubt, that you find that he was, at the time of the killing, so really insane as not to be responsible for this particular act, you acquit, otherwise you convict."

This is claimed by the prisoner's counsel to contravene the rule established in trials for capital offences, that the prisoner is entitled to the benefit of a reasonable doubt of his guilt. And they thus paraphrase the rule, " if the jury had a reasonable doubt of sanity they should acquit." This is not the rule, but a perversion of it; and the very language used begs the whole question. It assumes that (on the part of the prosecution) sanity is to be proved: for it is too plain to admit of argument, that the rule (as to a doubt) never did and never can apply to what the prosecution is not bound to prove. And sanity is not a condition or state which the law compels the prosecution to prove.

Being man, the accused is possessed (in legal presumption) of the powers and faculties of body and mind, which are included in the name. And the only proof to be made on that point, is that of the defence; and the defence asserts the fact that the prisoner differs from other men; that the reason, which is a part of his human nature, is impaired or lost; that he has ceased (by the positive operation of disease) to be the accountable agent described by the word man. Of necessity, and to the least informed understanding, the burden of proving this fact rests on him who asserts it; and suspicion is not proof—a doubt is not proof; raising a doubt is not proving a fact. These positions are but amplifications of the charge which is objected to. And the true tenor of that charge, its length and breadth, with or without the words " beyond a reasonable doubt," is fully covered by what, though not in the bill of exceptions, was actually part of the charge as given to the jury : " The prisoner must satisfy you by proof, that he was so far really insane, as not to be responsible for this particular act." This surely covers the whole ground. For, if on any point the mind be satisfied, it is utterly impossible

The People agt. McCann.

that it can on that point have "a reasonable doubt." The two states of mind—doubt and satisfaction—cannot co-exist on one point. And to apply to this the most unquestionable legal principle, a jury cannot find a fact, as proved, which is not proved to their satisfaction. By their oath they are bound to find "a true verdict according to the evidence," and the fact of insanity is to be found, not suspected. Every proper charge, touching on insanity to a jury, says : if you find that the prisoner was insane at the time, you acquit.

Thus far, as a matter of reasoning. Let us now see what, if any, is the authority ; and for this, we cannot probably do better than to resort to the opinions given to the house of lords, to which both parties before us, and all our own reported cases, are so ready to refer ; and (*at pages* 134 *and* 135 *of* 47 *Eng. Com. Law Rep.*) I find all that is by them said on this point, in the opinion (of all but Justice MAULE, who says nothing on this point,) given by the chief justice, which says : " The jury ought to be told in all cases, that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction ; and that to establish a defence on the ground of insanity, it must be clearly proved that at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing ; or if he did know it, that he did not know he was doing what was wrong." I can see no point of the preceding reasoning, in support of the charge, which is not completely covered by this opinion. "Proved to their entire satisfaction," is even more absolute in signification, without the words, "beyond a reasonable doubt," than it would be with them ; and so far as I am informed, (by the argument or otherwise,) there is no au-thority varying from this but the 2*d Alabama*, 43, and from that the quotation (on the points for the prisoner) is such, as by no means to entitle it to prevail against the opinion above quoted. Mark the phrase, "every member of the jury may have had a reasonable doubt of the prisoner's sanity." This

is, perhaps, a degree above suspicion, but if it be, it does not state the issue, it reverses it, since such a remark can apply to no point, which the prosecution is not bound to prove.

In the very ingenious and strongly urged argument in behalf of the prisoner, two matters of defence were claimed to be analogous to that of insanity; in each of which two, the prisoner is entitled to " the benefit of the doubt." But I think a strict examination of them will show that neither one really bears out the supposed analogy. The first of them is an *alibi*. This surely affords no parallel to the defence of insanity; as presence at the act (unlike sanity) is not presumed, and the proof of an *alibi* (though in itself affirmative) goes to what the law assumes to prove affirmatively; that is, that the prisoner (the physical being on trial) did the act ;[1] and such defence is, substantially, but in the nature of conflicting evidence. It is not a separate or a seperable issue, but a fact, going to the main issue already made, and is a mere contradiction of the people's affirmative of the issue; a negative of an averment, necessary in the indictment, and one requiring to be made certain by proof, to the satisfaction of the jury, or (which as above shown is the same thing) " beyond a reasonable doubt," (and proof beyond a reasonable doubt cannot be predicated as necessary to both sides of one and the same issue,) so a reasonable doubt in that issue, the people's affirmative issue, of course, acquits.

So of the other asserted analogy, " a homicide being proved, the defence proves circumstances to show that the killing was in self-defence." The very statement shows it not analogous. The proof, though affirmative, (*i. e.* positive, not affirmative as meaning the affirmative side of an issue,) is but of circumstances connected with the very deed, with the doing of the act charged as a crime in the indictment, and to be proved by the people. Acting in self defence is part and parcel of

[1] The charge that the prisoner did the act, (which is all to be proved,) includes his presence where it was done. And an *alibi*, though in form, positive, is merely an argumentative negative of the main issue. Thus, I was at a different place, and, therefore, I was not present at the act, and could not have done it.

the transaction, of its very manner and substance; and (whether shown by the witnesses for the prosecution, or by the witnesses called by the accused) is but in the nature of conflicting evidence, on the main issue; like a cross-examination, going to the body of the charge. It is as strictly, but showing how the killing was done, as would be evidence (cross or direct) tending to show the killing to have been accidental. Nor is it sound, either in law or in logic, to say that insanity is like any other negation of the offence; that it is but saying this man did not commit it, but a different being, a mad man did it. This is already fully answered; this person did it, and if you assert, that he is a different being from what he appears to be, claim him to be governed by delusion, instead of reason, to be diseased, to be a mad man, prove it.

And it is but a modification of the same position, to say that if the act were done by an insane man, an essential ingredient of crime was wanting, there being an absence of intent; which intent (either presumed or proved) is an affirmative part of the prosecution's case, and is to be shown " beyond a reasonable doubt." To this, the answer is, the intent is not wanting, even were the person a raving maniac. The manaic intended to do what he did, to kill the person killed, (or there is a very different defence in accidental killing.) But the maniac is not responsible for his intent, or its consummation, though cunningly planned, long premeditated, and cruelly carried out. It is the responsibility that is wanting, and the excuse interposed to avoid this responsibility, (to prevent the effect of an intent, which unexcused has every essential of an intent legally criminal,) is not anything incident to, or part of, or connected with the act; but exists in the man, and not in his deed.

There is a further position on the prisoner's points, which deserves, at least, a passing notice. This " bill of exceptions " shows that no exception was taken on behalf of the accused, to any part of the charge; and that no request (on his part) to charge was denied. To any man of common sense, and much more to a lawyer, it would seem that the prisoner had, in the

charge to which he consented, nothing to complain of, and no right now to except to that to which he then agreed. But an act of the legislature (*Laws of* 1855, *p.* 613, § 3,) interferes with this plain common sense, and with this plain common law, and says that "whether any exception shall have been taken or not" on the trial, the prisoner, if convicted, can take (on writ of error, as matter of right) any exception in or out of the case, and shall be at liberty to claim a new trial on any ground he can find, or suggest, or invent, before the court above. Under this act, if the prisoner does not like the looks of his jury, or if he does, or if he thinks two chances better than one, or if he thinks it pleasant to play with the law, its officers and courts, or wishes to know the whole of the people's case, to fit to it a defence made up, he has only to allow an improper question to a witness to pass unchallenged, or even by his own suggestion have an improper ruling made, and then bring his writ of error, and bring in his false defence, and try his luck once more. And this experiment he may repeat as often as the shape of his case will let him. I think the act must be admitted to be most remarkably adapted to the attainment of justice ! Still, if such be the law of the land, it is to be enforced. Is it the law of the land ?

The constitution (*art.* 3, § 16,) says, no private or local bill shall embrace more than one subject, and that shall be expressed in the title; the title of the act in question is, "An act to enlarge the jurisdiction of courts of general and special sessions of the peace, in and for the city and county of New-York;" as plainly a local bill, as one for opening a park in that city. But the 3d section of the act, says: (at the page referred to) "every conviction, &c., shall be brought before the supreme court and court of appeals from the courts of oyer and terminer of this state ; or from the said court of general sessions, &c., by a writ of error, with a stay of proceedings as a matter of right." There is here put into a local bill a general provision totally different from the purposes of the act ; (embracing another subject, an entirely foreign jurisdiction, so far as the " city and county of New-York"

are concerned, and their " courts of sessions ") and one not ex-
pressed in the title, or intimated there. It is just such a pro-
vision as would not attract attention; as would slip in unob-
served by those who looking to the title, considered it a
merely local act, interesting to members from the city of New-
York and to them only. It is precisely within the mischief,
to remedy which the provision cited was put in the consti-
tution. And its general nature cannot make the bill other
than local, or give effect to either a trick or a blunder which
is a palpable fraud on both the law and the constitution. I
consider it plainly unconstitutional, as well as being in the
teeth of all legal principles, and all honest practices.

The discussion which its existence has permitted in this
case, I deem of much more consequence than any limited
mischief it may do ; and I am more than willing that the
points taken, should be followed out to a decision so authori-
tative, as to settle the law of this state, on questions so vitally
important to the community ; and I am gratified that, even
by the means of such a section, full and free opportunity may
be given to have any erroneous' decisions I may have given,
corrected by higher tribunals and abler judgments, although
until they have been so corrected, and to the end that the
correction may be as broad and clear as the error, I deem it
not only proper for me, but my duty, to give my reasons for
my acts, that both may be fully considered and may stand or
fall together, if indeed they belong together.

By the court—BROWN, Judge. I cannot give my assent
to the legal proposition embraced in the charge of the judge
upon the trial of this action ; I think it at variance with sound
reason, and the just and humane principles of the common
law. The killing by violence was clearly made out by the
proof, and the defence was insanity. The judge in the charge
treated the condition of the prisoner's mind as a thing sepa-
rate from the act which constituted the crime, and the delusion
or defect of reason, under which it was alleged the act was
committed, to be affirmatively established by the prisoner like

The People agt. McCann.

those defences in civil actions which admit the cause of action, but insist it has been determined by some subsequent matter, and until the homicide is made out to the satisfaction of the jury the burden of proof is upon the people, and if there is any doubt, the prisoner is to have the benefit of it. But whenever the killing is proved or admitted, and the question of sanity arises, the issue and the burden as well as the party to be benefited by the existence of a reasonable doubt, is changed. If the principal question, and indeed the only question litigated, is involved in so much uncertainty, that the jury are unable to say whether the prisoner was sane or insane, whether in fact he was a responsible creature, or one without reason, their duty was to convict and not to acquit. This is the theory of the charge. It is very technical and artistic, and strictly applicable to defences in civil actions upon matter arising subsequent or separate from the cause of action, but not to crimes which consist of acts, coupled with intentions animating minds capable of reason and reflection, and of comprehending the distinction between right and wrong. So that there be no misapprehension, I quote from the charge as I find it in the bill of exceptions. "The fact of killing," said the judge, "is admitted; that the act was done by the prisoner is not disputed. Thus the issue is really reversed from the usual one. The question of insanity is matter of positive defence, and it is a defence to be affirmatively proved; a failure to prove it is (like all the failures to prove any other fact) the misfortune of the party attempting to make the proof. And in this case, as in all other cases of fact, you are not to presume what has not been proved, under the distinctions, and upon the principles already given you. The act being plainly committed, and that the prisoner did it being undoubted, and the defence set up on his part that he was insane, the burden of proof is shifted. In the proof of the deed itself, if any reasonable doubt be left on your minds, the prisoner is to be acquitted, but as sanity is the natural state, there is no presumption of insanity, and the defence must be proved beyond a reasonable doubt. If (canvassing the whole evidence on

the legal principle laid down in the charge) the prisoner has satisfied you so far beyond a reasonable doubt, that you find that he was, at the time of the killing, so far really insane as not to be responsible (under the directions stated to you) for this particular act, you acquit, otherwise you convict."

It certainly is true, that sanity is the normal condition of the human mind, and in dealing with acts criminal or otherwise, there can be no presumption of insanity. But it is not true, I think, upon the traverse of an indictment for murder, when the defence of insanity is interposed, and the homicide admitted, that the issue is reversed and the burden shifted. The burden is still the same, and it still remains with the prosecution to show the existence of those requisites or elements which constitute the crime, and of these the intention or *malo animo* of the prisoner, is the principal. The doctrine of the charge proceeds upon the idea that the homicide is *per se* criminal; that the mere destruction of human life by the act of another, is without any other circumstance, murder, or some of the degrees of manslaughter. "The fact of killing," says the judge, "is admitted; that the act was done by the prisoner, is not disputed; thus the issue is really reversed from the usual one." It is doubtless true, that when the killing by the prisoner is established by proof, the law presumes malice, and a sufficient understanding and will, to do the act. The malicious purpose, the depravity of heart, the sufficient understanding and will, must actually exist, however. They are each of them as much the essence of the crime as the act of killing, and the rule which presumes their existence, is a rule of evidence and nothing else; and when the law presumes their existence, it recognizes and demands their presence as essential to constitute the crime. The jury must consciensciously believe they exist, or else they cannot convict. The killing of a human being by another is not necessarily murder or manslaughter. It may be either excuseable or justifiable. It may have been effected under either of those conditions referred to by the elementary writers, in which the will does not join with the act, and then it is not criminal.

We must be careful to distinguish between what constitutes proof, including those presumptions which the law regards as equivalent.to proof in a criminal case, and what we understand by the burden of proof. By the *onus probandi*, I understand, is meant the obligation imposed upon a party who alleges the existence of a fact or thing necessary in the prosecution or defence of an action to establish it by proof. It may be proved by the production of evidence the usual way, or the law under certain circumstances, in certain cases, may presume its existence without proof. But it is nevertheless a part of the case of the party who alleges its existence, and to be made out beyond any reasonable doubt. Whenever it may be presumed to exist in the absence of proof, the presumption may be repelled and overcome by evidence; and whenever the repelling proof leaves the fact to be established in doubt and uncertainty, the party making the allegation is to suffer, and not his adversary. Sound memory and discretion at the time of killing, is oftentimes the only material question upon the trial of an indictment for murder. They are essential elements of the crime, to be established upon the trial as a part of the case of the prosecution. A vicious will without vicious act, says Mr. Blackstone, (*Com. Vol.* IV, 21,) is no civil crime. So on the other side, an unwarrantable act without a vicious will, is no crime at all; so that to constitute a crime against human laws, there must be, first, a vicious will, and secondly an unlawful act, consequent upon such vicious will. If there be a doubt about the act of killing, all will concede that the prisoner is entitled to the benefit of it, and if there be any doubt about the will, the faculty of the prisoner to discern between right and wrong, why should he be deprived of the benefit of it, when both the act and the will are necessary to make out the crime. The same writer also remarks that where there is a defect of understanding, the will does not join with the act. For where there is no discernment there is no choice, and where there is no choice there can be no act of the will, which is nothing else but a determination of one's choice to do, or abstain from a particular action. He, there-

The People agt. McCann.

fore, that has no understanding, can have no will to guide his conduct. I am not controverting the legal presumption in favor of sanity until the contrary appears. I am not dealing with legal presumptions of any kind. I am treating of doubts and uncertainties touching guilt or innocence, which arise upon the trial of most capital offences, and of the obligations which the law imposes, and which reason and humanity demand, that such doubts and uncertainties shall be removed before there can be a conviction, and a consequent deprivation of life.

It is worth while now to turn to the definition of the crime at common law, as given by the old writers, in order to see of what it consists. The statute has introduced some slight modifications, but for all the purposes of the present inquiry, the definition remains the same. It is thus defined by Sir Edward Coke (3 *Just.* 77 :) " When a person of sound memory and discrimination unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, express or implied." It is to be remarked that every member of this sentence is of the mightiest import in determining the constituents of the crime. The killing must have been effected by a person of sound memory and discretion. It must have been unlawful killing; that which is deprived of life must have been a reasonable creature in being, under the king's peace, and the killing must have proceeded from malice, expressly proved, or such as the law will imply, which is not so properly spite or malevolence to the deceased, as any evil design in general—the dictate of a wicked, depraved and malignant heart. Every one of these things must have existed, in order to make out the crime, and they must be proved or presumed upon the trial to have existed, or the prisoner is to be acquitted. They are primarily a part of the case for the prosecution, to be established to the satisfaction of the jury beyond a reasonable doubt. The law presumes malice from the mere act of killing, because the natural and probable consequences of any deliberate act, are presumed to have been intended by the author. But if the proof leaves it

in doubt whether the act was intentional or accidental, the scales are so equally balanced, that the jury cannot safely determine the question, shall not the prisoner have the benefit of the doubt? And if he is entitled to the benefit of the doubt, in regard to the malicious intent, shall he not be entitled to the same benefit upon the question of his sanity? his understanding? for if he was without reason and understanding at the time, the act was not his, and he is no more responsible for it than he would be for the act of another man. The cases which have arisen under the license laws, and the English game laws, and when the doubt has been upon the existence of the license, or the necessary qualifications, are not analogous to the present, because the necessary qualifications and the license upon which the defendant relied for a defence, are entirely separate from, and independent of the acts which constituted the offence. In the *Com.* agt. *York,* (1 *Bost. Law Rep.* 510,) question in dispute was, provocative or natural combat; the supreme court of Massachusetts held that "if the case or the evidence should be in *equilibrio,* the presumption of innocence will turn the scale in favor of the accused. But if the evidence does not leave the case equally balanced, then it is to be decided according to its preponderance." In the case of *Com.* agt. *Rogers,* (1 *Met.* 500,) the defence was insanity, and it was held that being in the nature of a confession and avoidance, must be shown beyond a reasonable doubt, to entitle the jury to acquit the accused. These two cases are irreconcilable in principle, and the reason given for the latter is utterly unsound for the defence of insanity. So far from confessing the offence, I think seeking to avoid it, denies absolutely the existence of sufficient capacity to incur guilt and commit crime. The answer of the judges, as given by Ch. J. SIMDAB, in *McNaughton's Case,* (47 *Eng. Com. Law Rep.* 129,) does not by any means dispose of the question under consideration. He says: "The jury ought to be told in all cases, that every man is to be presumed to be sane, and to possess a sufficient degree of reason, to be responsible for his crimes, until the contrary is proved to their satisfaction, and that to establish a

The People agt. McCann.

defence on the ground of insanity, it must be clearly proved that at the time of the committing of the act, the party was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did, that he did not know he was doing what was wrong." These expressions are not without their value, but they furnish no guide when the question is shrouded in doubt and obscurity. When psychological science shall be able to define with precision, the exact line where reason leaves and unreason supervenes, then we shall be better able to say what is to be considered the clear proof of a defect of reason referred to in this opinion. What was said by Ch. J. HORNBLOWER, in State agt. Spencer, (1 Zabriskie,) is not inconsistent with itself. After asserting that when there is doubt of the insanity, the jury ought to find against the prisoner, it proceeds to say: "I do not mean to say that the jury are to consider him sane, if there is the least shadow of a doubt on that subject, any more than I would say they must acquit a man when there is the least shadow of doubt of his having committed the act. What I mean to say is, that when the evidence of sanity on the one side, and insanity on the other, leaves the scale in equal balance, or so nearly poised, that the jury have a reasonable doubt of his insanity, then a man is to be considered sane, and responsible for what he does. But if the probability of his being insane at the time, is from the evidence in the case very strong, and there is but slight doubt of it, then the jury would have a right, and ought to say, that the evidence of his insanity was good." I find it difficult to reconcile the different parts of this opinion. The result, however, seems to be, that the jury are to be governed by the degree of uncertainty in which the question is left by the proof. Whatever has fallen from these eminent men, will doubtless be accepted with the most profound respect; but what they have said would be entitled to greater weight upon the present occasion, did it distinctly appear that their attention was directed to the circumstance, that notwithstanding the legal presumption, the sanity of the prisoner's mind

is, under all the definitions of the crime, to be made out affirm-
atively upon the trial, as a part of the case for the prosecu-
tion.   I conclude, therefore, that the judge erred in his charge
to the jury.   If my brethren see no objection to the form in
which this question comes before the court for reversal, under
the provision of the 3d section of the act of the 12th of April,
1855, to enlarge the jurisdiction of general sessions of the
peace in and for the city and county of New-York, (a subject
which I have not been able to examine,) then the judgment
should be reversed and a new trial granted, whatever may be
the event.   I have deemed it a fit occasion to discuss the
principal question involved in the judge's instructions to the
jury, to the end that those who preside at the trial of persons
accused of capital offences, may know whether the presump-
tion of innocence applies to all, or only some of the facts
which constitute the crime.

## JUDGE GOULD'S CHARGE.

_Gentlemen of the Jury :_—It has been stated to you that in
this case, you are called on to discharge a very unusual duty,
that of passing upon the guilt or innocence of a man, who is
now for the _third time_ on trial for his life.   This is certainly
true, gentlemen.   But while it may well be that it is an un-
common, perhaps an unparalleled circumstance, it is equally true
that the manner and the means by which it has been brought
about, are as uncommon, and I trust will continue to be with-
out any parallel.   It certainly does not lie with the prisoner
to _find fault_ with it ; or with his counsel to ask at your hands
any consideration on account of it ; since the conviction, (ob-
tained at the first trial,) was set aside at the prisoner's request
and _in his favor_, by a most peculiar application of the mercy
of the law.

To attain this end, the court of appeals introduced a new
principle into our criminal law.   And as the opinion given by
Mr. Justice BROWN in that court states (with commendable
complacency) that it is written, " that those who preside at the

trial of persons accused of capital offences, may know" their duty; I being unfortunately one, am compelled to examine that opinion, and to charge you in accordance with it. And I shall certainly do so, as far as I am able.

This new principle is, however, not the only unusual point that was needed to reach a new trial after the first conviction. The legislative wisdom of 1855, had seen fit to provide that, in capital cases, a person convicted in any court of oyer and terminer, should be entitled to his *bill of exceptions as a matter of right;* and on the appeal might take any exception warranted by the whole case, *whether or not he took any exception on the trial.* The wisdom of this law we may not question, since courts (other than the highest) are bound to *administer* laws, not *make* them.

Under this invaluable provision, this prisoner was enabled to take a bill of exceptions, *upon an exception not taken at the trial.* Not only so, *but to take an exception and obtain a new trial upon a charge given upon and in precise accordance with the written request of his own eminent counsel, the present attorney-general of this state.* That written request I now read from my minutes of the first trial:

" That if the jury *is satisfied from the evidence,* that at the time the alleged offence was committed, the prisoner, in consequence of partial insanity, was laboring under such a defect of reason as (not to be conscious of the nature, character and consequences of the act, or) not to know that the act was wrong— he should be acquitted."

My variation from this request was in another part of the charge, and was merely *verbal,* (to make the rule plain to the comprehension of twelve men who were not lawyers,) that he must have proved the existence of the insane delusion to the satisfaction of the jury *beyond a reasonable doubt,* or they would convict. To a lawyer, or any logical reasoner, it is superfluous to add that *if the jury were satisfied*—they were necessarily satisfied beyond a reasonable doubt.

The *personal* character and standing of the attorney-general are far too high to allow any one to suspect that his request

was intended as a *trick* to avoid the risk of conviction, by *preparing a concealed ground* for obtaining a new trial. And his *legal* character and standing are an abundantly sufficient guaranty that his opinion that *such was the law*, was in accordance with all prior legal precedents. The prisoner being thus shown to be here *at his own request*, as well as in direct contravention of all ordinary rules and proceedings, he is entitled to *no more* consideration at your hands than if this were a first trial ; nor is he or the public, therefore, to receive *any less*.

Fortified thus by the written opinion of the highest law officer of the state, I may proceed to say that we may fairly assume that the principle laid down by the court of appeals is *new*, when after all the researches of the prisoner's able counsel, and after repeated and elaborate discussions, and (of course) full and profound judicial investigation, *no one decided case* is even hinted at by Mr. Justice BROWN, as bearing out the rule imposed on the prosecution in this case ; while the opinion given as a guide finds it necessary to combat adjudications of high authority.

It is true that the rule is claimed to be founded on what is stated to be Sir Edward Coke's *definition* of murder, which is thus given : " Where a person of sound memory and discretion unlawfully killeth any reasonable creature, in being and under the king's peace, with malice aforethought, express or implied," (*citing* 3 *Inst.* 47.) On this it is to be remarked that the citation seems to be taken from Coke at second hand, as found in Blackstone, (4 *Com.* 195.) But Blackstone did not correctly cite Coke, for Coke's language is : " Where a man of sound memory, and *of the age* of discretion, unlawfully killeth," &c.

Blackstone, be it observed, does *not* give that sentence of Coke's as a *definition* of murder, for he says : " Murder is therefore now defined, *or rather described*, by Sir Edward Coke." And Blackstone himself, had (in the same chapter) before given his own *definition* of all kinds of *felonious homicide*, as, " the killing of a human creature *without justification or excuse*." And after this, in separating the grades of homicide into mur-

der, manslaughter, &c., he inserts the above cited description by Coke.

In the state of New-York, the *statute* of New-York—judicially known to every court—gives the *definition* of murder which binds us. And that definition is, in substance identical with Blackstone's. It is thus, (2 *Rev. Stat.* 656, 657, *combining sections* 4 *and* 5 :) "The killing of a human being without the authority of law, when perpetrated from a premeditated design to effect the death, &c., *is murder.*" And this "premeditated design," is, by our courts, decided to be *the intent to do the act done,* of which death was the natural consequence; the prosecution being *never* bound to *prove the intent otherwise than by the act,* leaving matter of excuse to the defence; the legal shape of an issue (with its incident, the burden of proof on the affirmative,) not being changed by the mere grade of the crime.

In any prosecution, the *proofs are to follow the allegations,* and *only* what is alleged is to be proved. And under *our statute* no indictment for murder need allege anything about the prisoner's sanity. It is a mere begging of the question to say of sanity : "It is nevertheless a part of the case of the party who *alleges* its existence, and to be made out beyond a reasonable doubt," when the prosecution has *not* made, and is not bound to make *any such allegation.* And if it *proves all it alleges,* it makes out its case, leaving the opposite side to establish its defence.

To dispose, however, of the written requests to charge now made by the prisoner's counsel, (before concluding what I cannot, if I would, avoid saying to you, as to the rule said to be laid down for me,) I now proceed to read those requests and charge as thereby desired, with merely one or two brief words of explanation, which I deem not to vary the tenor of the requests.

1st. That if at the time of the homicide, the prisoner, by reason either of *delirium tremens,* or other partial insanity, believed, (when he was committing the homicide,) that he was fighting with men who were supposed by him to be present;

" and the killing was done *in the fight* he believed to be going on, and as a part of it; and was *thus connected with the delusion*," such delusion would release him from criminal responsibility for the act committed under its influences.

2d. That if by reason of partial insanity, the prisoner, at the time the alleged offence was committed, was laboring under *such a defect of reason as not to be conscious of the real nature and character* of the act, he should be acquitted.

3d. That it is sufficient to constitute the defence that the homicide was the *offspring of insane delusion*, without reference to any other test or criterion.

4th. That it is not necessary, in order to *constitute the defence of insanity*, that the facts *supposed by the prisoner to be true*—but which were untrue, *should have been sufficient, if true, to constitute a defence in law*, to the act committed by the prisoner *under the influence of the delusion*.

5th. That if, *by reason* of partial insanity, the prisoner killed his wife *while he labored under the delusion* that he was *defending himself in a supposed fight* with persons who were his enemies, he should be acquitted.

6th. That if *upon the whole evidence* in the case, the jury entertain a *reasonable doubt* whether the prisoner *at the time* of committing the homicide, *was of sound mind and memory,* " *so far as to be conscious of the real nature and character of the act*," he should be acquitted.

7th. That a *reasonable doubt* upon the whole evidence, in regard to the *sanity* of the prisoner *at the time* the homicide was committed, enures to the benefit of the prisoner, and will entitle him to an acquittal. " This limited to his being *so sane as to be conscious of the real nature and character of the act*."

(Such portions of the foregoing points as are quoted, were added by Judge GOULD.)

Having thus given you the prisoner's views of the case, which commence with taking it for granted that he is *to prove insanity;* and end with claiming the benefit of the *shadow of something not proved*, I return to apply to those requests, and the whole case, the *opinion* given on granting to the prisoner

a new trial.. That opinion cites, as *expressions not without their value*, the unanimous opinion of the fifteen English judges, given by Ch. J. TINDAL, "that the jury ought to be told in all cases, that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, *until the contrary is proved to their satisfaction;* and that to *establish a defence* on the ground of insanity, it must be *clearly proved* that at the time of committing the act, the party was laboring under such a defect of reason *from disease of the mind,* as not to know the nature and quality of the act he was doing, or if he did, that he did not know he was doing what was wrong." I do not perceive that the court gave any shadow of dissent from these views. It is, to be sure, added by Mr. Justice BROWN, that "they furnish no guide when the question is shrouded in doubt and obscurity." If by "the question," be meant the question of actual insanity, and that the opinions cited, furnish (in any given case, which is shrouded in doubt and obscurity,) no guide by which *a jury can decide the fact of insanity,* it is plain enough. And this is the only meaning I can deliberately attach to that remark; since my great respect for that court will not allow me to suppose that it was intended (while not merely *not* overruling, but actually approving those opinions,) to say that sentences so clear and positive furnish *no guide as to the rule of law,* and do *not* say that the *fact of insanity* must be *clearly proved* to the *satisfaction* of the jury; or that those fifteen judges did not hold that it was for the *prisoner* to "*establish his defence* on the ground of insanity," by *clear proof of it.*

Still, gentlemen, whether or not to my feeble judgment the parts of this opinion be reconcilable with each other, I am bound by the ultimate *decision,* and am not responsible for an inconsistency which perhaps I am under a delusion in supposing that I see. That decision imposes on me the duty of saying to you, that even on this issue the prisoner is entitled to the benefit of any reasonable doubt you may entertain of his guilt, in view of the proofs he has made to you that at the time of committing this crime, (for that he *did the deed is admitted,*)

he was insane, and therefore not responsible for his act. A reasonable doubt means one that has some real foundation; one that has so much of *substance* that it prevents your minds from being *fully satisfied* upon its subject.

I do not understand that a mere assertion of insanity, a mere *notice* of matter of defence, even now *constitutes a defence*, and compels a jury to do violence to their consciences and acquit in defiance of their oaths. In coming before you as

> " A creature, who not prone
> And brute as other creatures, but endued
> With sanctity of reason, may erect
> His stature,"

in coming as a *man*, the prisoner is amenable to the law, unless *he shows* some exemption from it. And so to make that out, that you shall be in uncertainty as to his guilt, he must go farther than an *insinuation*, and excite in your minds something far stronger than a mere *suspicion*. You are not bound even in a capital case, nor are you allowed to refrain from finding a verdict of guilty, because you have not arrived at *absolute certainty*. Nor will you waste your time nor strain your oaths in the worse than useless inquiry whether a conclusion which you *fully believe* to be true, may not *possibly* be erroneous. Absolute certainty on facts not apparent to the senses, belongs not to human minds. It can hardly be predicated of what you see and hear, so liable are even our senses to be deceived. An optical delusion, a feat of legerdemain, defies them. But you are not, therefore, the less bound to render a verdict, and that verdict is to be the one which, on the whole case, after weighing all the evidence, you in your own minds and hearts *are satisfied is true*. If in your own minds you make up a *full belief*—come to a *definite conclusion*—no consideration of time or of eternity should prevent your saying so by your verdict. You should permit in yourselves no hesitancy to act on your *honest convictions*. No too finely spun web of *apprehension* should prevent your doing your whole duty, and meting out to the public, as well as to the prisoner, *justice*. Both appear before you; and between the two you stand represent-

ing the majesty of the law—sworn to declare the truth as in your calm judgments, in your hearts, you find it. With no other guide, with no responsibility for the correctness of the rules given to you by the court, with no responsibility for what the law may make the *consequences* of your finding, you will proceed to the discharge of your duty impartially, honestly, *fearlessly*. Face it like every other duty. So meet it that hereafter your own consciences shall not reproach you with having been either unnecessarily severe or criminally weak.